# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **S.T., a minor by and through his** *guardian ad litem* **JESSICA NIBLETT,** | **1:16-cv-01713-LJO-SAB** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **CITY OF CERES; JUSTIN CANATSY; JESUS SALINAS; AND DOES 1-10,** | **(ECF Nos. 24, 37, 39)** |
| **Defendants.** | |

## I. <u>INTRODUCTION</u>

This case arises from the shooting death of Albert Thompson ("Thompson" or "the Decedent") in the City of Ceres ("Ceres") by two police officers. The Decedent's surviving child – S.T., a minor by and through his *guardian ad litem* Jessica Niblett, ("Plaintiff") – brings claims individually and as successor in interest to his father's estate. Plaintiff brings the instant civil rights action against the City of Ceres ("Ceres"), police officers Justin Canatsy ("Canatsy") and Jesus Salinas ("Salinas") ("officer Defendants"), and unknown law enforcement officers ("Doe Defendants") (collectively, "Defendants"), alleging that the use of deadly force violated the Fourth Amendment and the Fourteenth Amendment, as well as alleging several California state law claims.

Defendants moved for summary judgment on all causes of action on June 28, 2018. ECF No. 24. Plaintiff filed an opposition on July 18, 2018, ECF No. 37, to which Defendants filed a reply on July 24,

2018. ECF No. 39. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Venue is proper in this court, and the matter is ripe for review. The Court deems the matter appropriate for resolution without oral argument. *See* E.D. Cal. L.R. 230(g). Having carefully considered the record in this case, the parties' briefing, and the relevant law, the Court grants in part and denies in part Defendants' motion.

## II. <u>FACTUAL BACKGROUND</u>[1]

On January 5, 2016, Thompson was shot and killed by two police officers. The only testimony concerning the events that led to Thompson's death came from the two police officers involved in the incident, officers Canatsy and Salinas.

On January 5, 2016, officers Canatsy and Salinas arrived at an apartment complex located at 2601 Don Pedro Road in Ceres, California sometime after 9 p.m. UF 3, 7. The apartment complex layout was rectangular with apartments on the north and south side, and a parking lot in the central area between the apartments. Ex. C; UF 10.[2] The south side apartments ran parallel to Don Pedro Road. *Id.* The entrance into the parking lot of the complex was at the southwest corner at the intersection of Don Pedro Road and El Camino Avenue. *Id.* The officers parked their patrol vehicles on Don Pedro, a short distance away from the entrance of the apartment complex. UF 9. Canatsy had information that a wanted parolee-at-large, David Manchaca, might be at the apartment complex and he discussed this with Salinas before they decided to go to the subject location to look for and arrest Manchaca. UF 3-5. Manchaca was reportedly armed and dangerous, around 6 feet tall with a medium build. UF 6. Both officers personally knew that the apartment complex was known as a location for drug dealing and sales. UF 8.

---

[1] Unless otherwise indicated, the facts set forth in this section are drawn from facts asserted by Defendants in their statement of undisputed facts and explicitly undisputed by Plaintiff in his response to Defendants' undisputed facts. Plaintiff also submitted an additional statement of undisputed facts to which Defendants responded. Defendants' Response to Plaintiff's Response to its Statement of Disputed and Undisputed Facts and to Plaintiff's Additional Undisputed Facts ("UF" and "PUF"), ECF No. 39-1.

[2] During their depositions, Canatsy and Salinas were provided diagrams of the apartment complex and indicated their locations and movements on the night of the shooting respective to Thompson's. UF 10; Exs. C-F.

At some point after arriving, the officers covered their badges with black latex gloves. PUF 86. According to the officers' testimony, the officers did so for officer safety reasons, to prevent light from reflecting off their badges while they were waiting for Manchaca. Ex. A, Deposition of Justin Canatsy ("Canatsy Dep.") 30:21-31:12; Ex. B, Deposition of Jesus Salinas ("Salinas Dep.") 17:1-16; *see also* PUF 86. After arriving, the officers spent a few minutes looking around the complex. Canatsy called his informant who had indicated that Manchaca was at the subject location, but he did not answer. Canatsy Dep. 34:18-35:2, 40:7-41:1. While the officers were standing in front of the apartment complex on the west side near El Camino Avenue, Canatsy observed a man, later identified as Thompson, walk out of the entrance way of the complex. Canatsy Dep. 40:7-41:10.[3] The officers both believed that Thompson could possibly be Manchaca. UF 14-15. Salinas testified that he had never seen Manchaca so it is not clear if he would have been able to recognize him. Salinas Dep. 19:21-20:3. However, the lighting conditions at the apartment complex were dark, particularly at the entrance. UF 11.[4] When Canatsy first saw Thompson, all Canatsy could see was that he was wearing dark clothing and "just blended in with the dark." PUF 93. All Canatsy knew was that "he was a male and that was pretty much it." *Id.*

A.      **Undisputed Facts Regarding The Shooting Of Thompson**

Thompson was shot twice while running away from the officers in the parking lot of the 2601 Don Pedro apartment complex somewhere between the entrance on the southwest side, and the northeast side of the parking lot near where his body was found. UF 32, 42, 61-64; PUF 86, 105, 119, 122, 124-

---

[3] Salinas testified that Canatsy told him to follow him and they started walking towards the entrance way of the apartment complex, at which point he saw Thompson and realized why Canatsy had indicated for him to follow him. Salinas Dep. 22:18-23:12.

[4] There are some inconsistencies in the testimony as to the lighting conditions at the complex. In his interview for the internal affairs ("IA") investigation, Canatsy described the area as "real dark[,]" especially in the entrance area, "zero lights at all. It was super dark where we were first standing." ECF No. 38-14 at 3-4, Ex. 4; UF 11. Canatsy confirmed in his deposition that it was very dark. Canatsy Dep. 37:4-10. By contrast, Salinas stated in his IA interview that "there's pretty good lighting" in the parking lot and in his deposition he stated that the lighting was "dark to low light, very low light." *Compare* ECF No. 38-5 at 3, Ex. 5 *with* Salinas Dep. 20:4-6; *see also* PUF 92. The IA investigation report stated "[i]n its natural environment, the scene is dark with ambient lighting emitted by a light pole on the right side…" ECF No. 31 at 9, Declaration of Jose Berber ("Berber Decl."), Ex. A.

126. The officers were about 8 yards away from Decedent when they shot Decedent. PUF 98. The officers fired three volleys of shots during the encounter. UF 29-49. Canatsy testified he shot between 2-4 rounds and Salinas testified he shot between 5-6 rounds. PUF 98. Approximately 20 shell casings were found at the site of the shooting. PUF 127. According to the dispatch recording, approximately 14 seconds elapsed between the time that the officers reported to dispatch that they had "one running" from them and then reporting "shots fired". ECF No. 27-8, Ex. H.[5] Canatsy believes he reported "shots fired" after the third volley. Canatsy Dep. 80:8-15.

At no point during the series of events did Thompson shoot at the officers or verbally threaten them. PUF 100; Canatsy Dep. 72:18-25; *see also* Salinas Dep. 38:25-40:25. Neither officer gave any warning before shooting the Decedent in any of the three volleys of shots. PUF 99, 110. In none of the volleys was there a pause between the shots. Canatsy Dep. 71:11-13; Salinas Dep. 30:21-22. Both the officers had cover during the second and third volley of shots. Canatsy Dep. 73:6-14; Salinas Dep. 31:15-21. No gun was found on Decedent, but a butane hand torch was found near Decedent's body. PUF 97.

Dr. Baik, the Sheriff's coroner, conducted the post-mortem examination of Thompson and recovered two bullets from Thompson's body. UF 59, 62. It is undisputed that Thompson was shot in the back. PUF 122, 124, 125. Both bullet trajectories go from right to left, back to front and slightly upward. PUF 122. Further, based on Dr. Baik's deposition testimony, the parties agree that based on the upward slant of the bullet trajectories, Thompson was likely in a bent position, running away when he was shot. UF 126; ECF No. 39 at 4 (Dr. Baik concluded "that Thompson was bending over when the bullets struck him in the back as he ran."). While Dr. Baik was not able to conclude the sequence of the two bullets, he

---

[5] Plaintiff submits, and Defendants do not dispute, that according to the dispatch log transcript at 22:01:49, one of the officer's radioed "got one running," and at about 22:01:52, about three seconds later, one of the officers radioed "shots fired." PUF 120, citing ECF NO 38-7, Ex. 7. However, the audio recording of the dispatch that was submitted indicates that approximately 14 seconds elapsed between the two radio calls. The Court credits the latter as more accurate as it is not clear how the dispatch log transcript was generated. While the exact time that elapsed between the running call and the shots fired call is not critical to the determination here, it provides context for the very brief period of the time in which the events unfolded.

did determine that the trajectory of one of the bullets left Thompson "no chance" of survival because it struck Thompson's heart and lung and that the other bullet was fatal without immediate surgery. UF 61, 65-66; PUF 123.

The autopsy indicated that Thompson had methamphetamine in his blood at the time of the incident. UF 69.[6]

**B.    Defendants' Account Of The Shooting[7]**

After initially walking out of the entry way of the parking lot, Thompson turned around and walked back in to the apartment complex and the officers began to follow him. UF 13, 17-18. The officers testified that when they first observed Thompson near the entrance of the parking lot, Canatsy gave him the command "hey, police, come here" to which Decedent replied "what's up guys." UF 17, PUF 94. Thompson turned and walked back into the apartment complex even after they identified themselves as police officers. UF 13, 16.[8]

Both officers testified that Thompson walked away from them with his hands near his waistband or pocket while looking back towards the officers. UF 17-18. According to the officers, Thompson then suddenly turned and faced the officers but continued to back away from them deeper into the parking lot with his hands either inside his pockets or inside his waistband. UF 19-23. Plaintiff disputes what the officers were able to see as to where Thompson's hands were, citing the fact that both officers had stated how dark the lighting was near and in the complex. *Id.* Thompson then started to run away from the

---

[6] Plaintiff objects to the relevance of this fact. UF 69. Such an evidentiary objection is not necessary on a summary judgment motion since the Court only considers the material facts in making its determination. *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("objections to evidence on the ground that it is irrelevant. . .[is] duplicative of the summary judgment standard itself. . . and thus relevance objections are redundant."). This fact is not material to the Court's analysis here, therefore the objection is moot.

[7] Despite the citations to the statement of undisputed facts, Plaintiff disputes most of the facts contained herein as to what the officers testified happened once they encountered Thompson. Plaintiff cites to the conflict between what the officers testified occurred and the forensic evidence, as well as the lighting conditions in the apartment complex. *See* UF 17-35, 36-41, 43-49.

[8] Plaintiff contends that given Thompson's casual response of "what's up, guys," the dark lighting, and the concealment of the officers' badges, it is unclear whether the Decedent knew that Defendants were police officers. UF 16, 17. Other than identifying themselves as police officers and saying "come here," the officers do not clearly remember what else, if anything, was said that night. Canatsy Dep. 45:22-47:8; Salinas Dep. 25:7-10.

officers and Salinas radioed dispatch that Thompson was running from them. UF 24. Then Thompson stopped and turned about to face Canatsy and drew an object from his pocket or waistband, which both officers believed resembled a black handgun, and pointed the object in the direction of the officers. UF 25-28.[9] The officers then drew their firearms. *Id.* According to the officers there were three volleys of shots and approximately 7-10 rounds were fired between the two of them in the space between of the southwestern entrance of the parking lot to the northeastern end of the apartment complex. UF 29-49; PUF 98.

### 1. **First Volley**

The officers testified that they first fired because they believed Thompson was pointing a black gun-like object at them while running away from them in a northeastern direction and then turning to face them at a 45-degree angle. UF 29-32; Canatsy Dep. 50:15-52:12. Neither officer had the opportunity to warn Thompson before firing. *Id.* Following this volley, apparently Thompson then continued to flee northeast further into the parking lot. UF 32; Canatsy Dep. 57:24-58:4. Canatsy was not sure if any of the shots from the first volley struck Thompson. UF 36.

### 2. **Second Volley**

The officers then advanced further into the parking lot, pursuing Thompson, and took cover behind some of the vehicles parked on opposite sides of the parking lot. UF 33-35; Canatsy Dep. 61:4-16. As Thompson was fleeing northeast, he continued to turn his upper body at a 45-degree angle towards Salinas and pointed the same black gun-like object at him and both officers fired a second volley toward Thompson. UF 38-40. The second volley was fired while Thompson continued running away and was bent over at the waist. UF 42. Canatsy observed that Thompson had fallen on the ground after the second

---

[9] As Plaintiff points out, and Defendants do not dispute, the officers also testified that they were not 100 percent certain what the black object was and that they could not see the object clearly. PUF 98; Canatsy Dep. 53:12-23; Salinas Dep. 25:12-19.

volley and before the third volley. UF 45.[10]

### 3. Third Volley

Both officers had taken cover by the time they fired the third volley of shots. Canatsy Dep. 69:7-19, 73:6-74:5; Salinas Dep. 35:10-22; 38:2-13. Canatsy knew that Salinas was behind cover at the time he shot his third volley. PUF 117. According to the officers' testimony, as Thompson was on the ground, Salinas observed him search the ground with his right hand and then he sat up and pointed the object at Salinas again. UF 47; Canatsy Dep. 72:11-15; Salinas Dep. 40:1-14. Salinas fired in response as did Canatsy, who also perceived the threat to Salinas. UF 47-48. After Thompson laid back down, the officers stopped shooting. Canatsy Dep. 72:11-15; Salinas Dep. 40:1-14.

After the shooting, the object the officers testified that they believed was a handgun was identified as a butane hand torch. UF 58; PUF 37; *see also* ECF No. 31 at 33, Berber Decl., Ex. A.

## III. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby, Inc.*, 477 U.S. at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a

---

[10] Salinas testified that after the second volley was fired, he saw two people get out of a car parked in the lot. Salinas Dep. 33:7-34:20. He told them to get inside and the two individuals went inside one of the apartments. Canatsy stated the he believed those individuals got out of the car after the third volley, but that he was not certain. Canatsy Dep. 74:22-75:4.

reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250.

# IV. **DISCUSSION**

In their motion, Defendants argue that officer Defendants use of lethal force was objectively reasonable because they were responding to an imminent lethal threat and the use of force was justified as a matter of law. ECF No. 24 at 1. Defendants also argue that they otherwise are entitled to qualified immunity. *Id.* Plaintiff counters that there is a material dispute of fact about whether the officer Defendants were reasonably threatened by Albert Thompson's conduct because their accounts of the events are inconsistent with the forensic evidence of Thompson being shot in the back as he was running away. ECF No. 37 at 1. In Plaintiff's opposition to Defendants' motion, Plaintiff conceded the claims in the first, third, fifth, and sixth causes of actions.[11] The remaining claims that are addressed by the Court in this Order are: (1) the second cause of action pursuant to 42 U.S.C § 1983 ("§ 1983") for excessive in

---

[11] Specifically, Plaintiff's withdrawn claims are Claim No. 1 (Fourth Amendment—detention and arrest); Claim No. 3 (Fourth Amendment—denial of medical care); Claim No. 5 (*Monell* municipal liability); and Claim No. 6 (California state law false arrest). Plaintiff indicates that Defendants failed to meet and confer in advance of filing their motion, as required by the Magistrate Judge's scheduling conference Order, which would have eliminated the need for briefing those claims. ECF No. 23. The Defendants are admonished for not abiding by the Court's Order and advised to carefully heed such orders in the future in order to avoid wasting litigation and court resources.

violation of the Fourth Amendment against officers Canatsy and Salinas; (2) the fourth cause of action pursuant to § 1983 for substantive due process violation of the Fourteenth Amendment against officers Canatsy and Salinas; (3) the seventh cause of action for battery (wrongful death) against all Defendants (4) the eight cause of action for negligence (wrongful death) against all Defendants; and (5) the ninth cause of action for violation of the Bane Act (Cal. Civ. Procedure Code § 52.1).

Because the Court agrees that there is a material dispute about what exactly precipitated the shooting of Thompson and whether the actions by the police therefore were reasonable, summary judgment is denied as to the second, fourth, seventh, eighth and ninth causes of action. As Plaintiff has withdrawn the first, third, fifth, and sixth causes of actions, summary judgment as to those claims is granted. Defendants' motion for summary judgment as to punitive damages against Defendant Ceres is granted as is the unopposed request to dismiss the Doe Defendants.

## A.    FOURTH AMENDMENT: EXCESSIVE FORCE

### 1.    Legal Standard

42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 638-39 (1980) (citation omitted). To succeed in asserting § 1983 claims, Plaintiff must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48 (1988). As the moving party, Defendants bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Plaintiff's] case." *Celotex*, 477 U.S. at 325. It is also Defendants' burden to prove that they are entitled to qualified immunity. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005). Here, the parties agree that officer Defendants acted under color of state

law, but dispute whether they violated the Decedent's Fourth Amendment rights.[12]

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen."); *I.A. v. City of Emeryville*, No. 15-CV-04973, 2017 WL 952894, at *5 (N.D. Cal. Mar. 13, 2017) ("A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from 'unreasonable ... seizures.'").

The Fourth Amendment requires law enforcement officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The essence of the objective reasonableness analysis under the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (citation omitted). The reasonableness of a particular use of force is determined through a three-step inquiry. *Id.* In the *Graham* analysis, a court must "first assess the quantum of force used to arrest [the plaintiff] by considering 'the type and amount of force inflicted.'" *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (citations omitted).

The second step is to determine the government's countervailing interests at stake in applying force. *Graham,* 490 U.S. at 396. "Relevant factors to this inquiry include, but are not limited to, 'the

---

[12] Plaintiff's Fourth Amendment claims are brought on behalf of the Decedent's estate. Plaintiff does not have standing to sue under the Fourth Amendment individually.

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (quoting *Graham*, 490 U.S. at 396). The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The *Graham* factors, however, are not exhaustive. *George v. Morris,* 736 F.3d 829, 837-38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos*, 661 F.3d at 441, courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio,* 392 U.S. 1, 20-22 (1968)); *see id.* at 396-97 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment.") (citations omitted). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Finally, a court must weigh in balance "whether the degree of force used was warranted by the governmental interest at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001). In this way, a court may determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002); *see also Young v. County of Los Angeles*, 655 F.3d

1156, 1161 (9th Cir. 2011) (a court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable") (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). But "even where some force is justified, the amount actually used may be excessive." *Santos*, 287 F.3d. at 853. The question in all cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting" the arresting officers and "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-97 (internal citations quotation marks omitted).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted). The Ninth Circuit has cautioned that excessive force cases pose "a particularly difficult problem" where cases involve the suspect's death, because "the witness most likely to contradict [an officer's] story" is not available to testify. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 1994) (citation omitted). In such cases the evidence should be carefully examined "to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* at 794-95; *see also Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (explaining that "we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts") (internal quotation marks and brackets omitted).

## 2. **Application**

In this case, the officers used deadly force, which is the most significant intrusion on Fourth Amendment interests. *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) ("use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has

a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'") (quoting *Garner*, 471 U.S. at 9).

The Court weighs the use of deadly force against the governmental interest in using lethal force by looking at the *Graham* factors. In assessing the governmental interest, the first *Graham* factor, the severity of the crime at issue, weighs in Decedent's favor. Decedent was not committing a serious crime (or any crime) when the shooting occurred. There is no evidence that the officers recognized Thompson from any prior contacts or had any information about who he was. They had no information that he had previously committed any crime, had any prior contact with law enforcement or had an involvement with weapons. *See e.g.*, *Gonzalez*, 747 F.3d at 792. While the officers testified they believed it was "possible" that Decedent was Manchaca, the parolee-at-large they had come to arrest, it is not clear that either officer had considered this information when deciding to pursue and shoot Decedent in the very brief amount of time in which the events unfolded. Moreover, both officers testified that it was dark at the entrance of the apartment building and therefore it is unclear to what extent they could have recognized Manchaca or anyone for that matter.[13] Therefore, the first *Graham* factor (the severity of the crime at issue) weighs in Decedent's favor.

The third Graham factor, whether the subject was actively resisting arrest or attempting to evade arrest by flight, is less clearly in Decedent's favor. While Decedent was running away from the officers when he was shot, it is not clear whether Plaintiff was aware Canatsy and Salinas were police officers. The officers testified that they identified themselves as police officers but were otherwise not clear about what they said to Decedent besides "hey, come here" before the chase and shooting ensued. Additionally, Plaintiff points to the fact that the officers' testified that Plaintiff may have responded by stating "what's up guys" indicating he did not know they were police officers. The brief amount of time that elapsed between when the officers confronted Thompson face-to-face and when he began running, coupled with

---

[13] Canatsy testified that he could make out that "he was a male and that was pretty much it." PUF 93.

the poor lighting and the fact that the officers may have had their badges covered weigh in favor of the possibility that Thompson may not have known he was being pursued by police. Even if Thompson was aware that he was being pursued by officers and was running from them, the Supreme Court has held that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Garner*, 471 U.S. at 11 (use of deadly force to prevent escape of robbery suspect was unreasonable). Here, Thompson was not a suspected felon making the case stronger for the unreasonableness of using deadly force to stop his escape. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*

Accordingly, the issue here rests almost entirely on the second, and most important, *Graham* factor – whether the Decedent posed an immediate threat to the safety of the officers sufficient to justify the use of deadly force. *See Mattos*, 661 F.3d at 441 (explaining that the second *Graham* factor is the most important). Defendants argue that Canatsy and Salinas drew their weapons when they saw Thompson, while facing them, point an object, which they perceived to be a hand gun, in the officers' direction before beginning to run from the officers. This prompted officer Defendants' first volley of shots. According to the officers, they continued to pursue Thompson as he ran northeast in the parking lot, still turning his body at a 45-degree angle toward Salinas and pointing the object towards him. Salinas believed that Thompson was shooting at him and both officers perceived a threat and fired a second volley of shots. At this point, the officers testified that Thompson fell to the ground and was lying on his left-side or his back and reaching around with his right hand.[14] Apparently fearful that Thompson was reaching for his gun while on the ground, Salinas and Canatsy fired a third volley. Both officers had

---

[14] At best the officers' testimony was equivocal, if not inconsistent, about which way Decedent was facing when he was lying on the ground prior to the third volley of shots. PUF 116. Canatsy first said he was not completely on his back "but to the— from what I remember, on like his right side[,]" but later said "I can't remember if it was left side…his stomach was in the air, so back on the ground." *Id.* Salinas testified Decedent "was lying on the left side of his body." *Id.* Salinas also testified that Decedent was reaching around for the purported gun with his right hand at this point. Salinas Dep. 36:12-37:12.

cover at the time they shot the second and third volleys.

Plaintiff counters that there is significant evidence that Decedent did not pose a threat at the time they fired at him. Plaintiff states that forensic evidence indicates that Decedent was running away from the officers and not presenting a threat to the officers at the time they shot at him. It is undisputed that Decedent was shot in the back twice while hunched over and running away. Additionally, Thompson was unarmed at the time he was killed. However, Defendants argue this is not the entire picture because Decedent was turned at a 45-degree angle, looking over his left shoulder and pointing a gun-like object with his right hand in the direction of the officers.

This critical dispute – whether the Decedent actually was turned and pointing an object at the officers or whether he was only running away hunched over – is sufficient to deny summary judgment. The Ninth Circuit's opinion in *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014) is instructive.[15] The Ninth Circuit held "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason." *Id.* at 1078. The Court also found "[c]onversely, if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him. . . ." *Id.* The Court concluded that to decide the case the jury would have to answer just one simple question – "[d]id the police see Cruz reach for his waistband? If they did, they were entitled to shoot; if they didn't, they weren't." *Id.* at 1079. The Ninth Circuit denied summary judgment on the excessive force claim because the only evidence of Cruz's threatening gesture was the officers' self -serving testimony and because there was circumstantial evidence that a jury could find that the officers lied. *Id.* ("[I]n the deadly force context, we cannot 'simply accept what may be a self-serving account by the police officer.'") (citation

---

[15] The facts of *Cruz* are worth noting because they are more favorable for the officers than the case at hand. In *Cruz*, a confidential informant told police that Cruz was a gang member who sold meth, was *carrying a gun in his waistband*, had stated he was not going back to prison, and had a prior felony conviction with a firearm that police were aware of. Police surrounded Cruz's car with their vehicles and he attempted to escape by backing his SUV into a patrol vehicle and then he got out of his vehicle and reached for the waistband of his pants and the officers opened fire and killed *Cruz. Id.* at 1077-78.

omitted). The case at hand similarly involves a determination of whether Thompson did in fact reach for an object and point it in the direction of the officers such that they were posed with an immediate threat.

First, there is circumstantial and forensic evidence in this case which similarly provides the need for a trier of fact to determine what occurred. As in *Cruz,* the "most obvious" "circumstantial evidence that could give a reasonable jury pause… is the fact that [Thompson] didn't have a gun on him, so why would he have reached for his waistband" or point an object at the officers as if it were a gun? *Id.* at 1079. "[I]t would have been foolish—but not wholly implausible—" for Thompson to reach for or point a blow torch at officers and continue to do so while running away as shots were being fired at him if he only possessed a blow torch. *Id.* A jury may doubt that Thompson did this or it may reach an opposite conclusion. *Id.* at 1080 ("the jury could also reasonably conclude that the officers lied.").

Secondly, the forensic evidence here shows that Thompson was shot in the back and this presents another reason to allow the trier of fact to determine reasonableness regarding factors such as the officers' account that he was angling his body, while running and hunching over, to point hand torch at them. *See, e.g.*, *Estate of Elkins v. Pelayo*, No. 16-16227, 2018 WL 2978522, at *2 (9th Cir. June 14, 2018) (citation omitted) (finding officer's testimony that he fired his gun immediately upon seeing decedent reach for his waist band because he feared for his life was "[not] ... consistent with other known facts, including the facts that [decedent] was running away and that [officer] had no reason to think that [decedent] was armed."). A reasonable jury could infer from the fact that he was shot in the back that the Decedent was facing away from the officers at the time that they fired and therefore did not pose an imminent threat to officer safety. *I.A.*, 2017 WL 952894, at *8 ("the fact that the forensic evidence is susceptible to another reasonable interpretation underscores the presence of a triable factual dispute."). A reasonable jury could conclude that the officer Defendants' testimony that the Decedent pointed an object resembling a gun in their direction, when he possessed no gun, is self-serving and not credible. "[B]ecause the record contains reasons to doubt whether" Officer Canatsy and Salinas saw Thompson reach for his waistband or continuously point an object at the officers, the decision of whether the officers were entitled to shoot

should be left to jury. *See Estate of Elkins v. Pelayo*, 2018 WL 2978522, at *3.

There is an additional layer to this case given the fact that there were multiple volleys fired. The second and third volley were fired after both officers had taken cover or had cover available. It is not clear whether it was reasonable to continue to shoot without pausing or giving warning in such circumstances where there was cover available and in the case of the third volley, when Decedent was already on the ground. *See I.A.*, 2017 WL 952894, at *9 ("a reasonable juror could find that it was feasible for [officer] to have issued warnings to [decedent] before firing the third volley, given that she was unarmed, wounded, and lying on the ground, and not moving toward her gun."); *see also Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) ("[W]henever practicable, a warning must be given before deadly force is employed.").[16] The Court concludes that Defendants have not met their burden of showing that there is no material dispute of fact that the officers' use of force was reasonable under the totality of the circumstances. Even in cases where individuals were armed with a firearm, courts have found that the question of whether the weapon was pointed in such a way that posed a threat sufficient to defeat summary judgment. *See Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017).[17] If the Decedent did not point the gun at the officers and "was not facing them when they shot him for the first time," or the second and third time, a jury could reasonably conclude that the use of deadly force was not reasonable. *Curnow ex rel. Curnow v. Ridgecrest Police Dep't*, 952 F.2d 321, 325 (9th Cir. 1991)

---

[16] Some of the potential inconsistencies between the officers' testimony and the other evidence, particularly with regard to whether Decedent posed a threat during the third volley, requires a jury to weigh the evidence. The officers testified Thompson sat up and pointed the purported gun at the Salinas after falling to the ground. This precipitated the third volley which concluded after Thompson fell to the ground again. While the evidence is not clear as to which of the volleys may have hit Decedent, Dr. Baik's testimony indicates that at least one of the shots may have been immediately fatal since it struck Plaintiff in the lung and heart. UF 66. Additionally, based the officers' testimony on how Thompson's body was angled and their positions during the third volley, it would not have been possible for the officers to hit Thompson in the back during the third volley. PUF 116; Exs. D, F; *see also* Salinas Dep. 36:12-37:12. Accordingly, whether it is credible that Thompson was moving around and sat up before the officers shot the third volley is a determination better left for the jury after weighing the evidence.

[17] In that case, the decedent was a 13-year old boy who was carrying what appeared to be an AK-47 in the middle of the day in a residential neighborhood. 871 F.3d at 1010-11. After the officers yelled "drop the gun," the decedent began to turn around "naturally in a clockwise direction" while still holding the gun. *Id.* One officer fired and fatally struck the decedent. *Id.* The Court considered that the gun "could have been raised to a slightly-higher level without posing any threat to the officers" and affirmed denial of summary judgment. *Id.* at 1015. The court held, on these facts, that a reasonable jury could find that the use of lethal force was excessive, and that the officer reasonably should have known that the application of deadly force under the circumstances was excessive under the Fourth Amendment.

17

(rejecting summary judgment where the suspect had a gun, but was not pointing it at the officers and was not facing the officer who opened fire); *Longoria v. Pinal County*, 873 F.3d 699, 706-07 (9th Cir. 2017) (dispute of fact regarding whether suspect assumed a threatening "shooter's stance" in interaction with officers precluded summary judgment).

Defendants argument that Decedent posed an imminent threat to officer safety rests on the testimony of the two shooting officers. The Ninth Circuit has admonished that "in the deadly force context, we cannot simply accept what may be a self-serving account by the police officer." *Cruz*, 765 F.3d at 1079 (internal quotation marks and citations omitted); *Long v. City and Cty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (the trial court must be "wary of self-serving accounts by police officers when the only non-police eyewitness is dead") (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Moreover, on a summary judgment motion, the facts must be viewed in the light most favorable to the nonmoving party. *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017). Here, at least some of the determination also rests on the credibility of the officer Defendants, which is an issue of fact for the jury to resolve. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) ("[W]e must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence."); *I.A.*, 2017 WL 952894, at *6 ("Construing all inferences in Plaintiffs' favor, a reasonable juror could conclude that Williams's account that Henderson aimed his gun at him is not credible, and that he did not act reasonably when he fired at her.")

The direction that the Decedent was facing and whether he was continuously pointing a gun-like object at the officers while running away at the time that he was shot are disputed facts and the record provides support for multiple interpretations and conclusions. These facts are also material, indeed critical, to the underlying question of whether the officers' use of force was reasonable. The poor lighting, the fact that Decedent had no gun, the forensic evidence, the brevity of the entire encounter along with the availability of cover, all are factors for the trier of fact to consider on whether Decedent posed an immediate threat of harm to the officers.

Because Plaintiff demonstrates that genuine issues of material fact persist, summary judgment on Plaintiff's second cause of action under Fourth Amendment for excessive force is DENIED.

### 3. <u>Qualified Immunity</u>

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Further, it "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*

To determine whether officers are entitled to qualified immunity, a court conducts a two-step inquiry. "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins*, 350 F.3d at 954 (citations omitted). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 231. To be a clearly established constitutional right, a right must be sufficiently clear "that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation and internal quotation marks omitted). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. "This is not to say that an official action is protected by qualified immunity unless the very action

in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted).

Consequently, at summary judgment, an officer may be denied qualified immunity in a § 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). In making this determination, the Court still must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

As discussed above, the facts, taken in the light most favorable to Plaintiff, show that the officers unreasonably used excessive force in shooting the Decedent in the back while he was running away from them and not threatening the officers. Therefore, the only question that remains is whether that right was clearly established at the time of the incident. It has long been clearly established that an officer may not use deadly force to apprehend a fleeing suspected felon. *Garner*, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."). Here, Thompson was not a suspected felon but was only fleeing. In *Curnow*, the court concluded that "[u]nder [non-moving party's] version of the shooting, the police officers could not reasonably have believed the use of deadly force was lawful because [the decedent] *did not point the gun at the officers and apparently was not facing them when they shot him the first time.*" *Curnow*, 952 F.2d at 325 (emphasis added); *see also Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (although suspect was armed, Court found that law was clearly established that "*Graham's* totality of the circumstances test does not permit the use of deadly force to kill a suspect who is running [away from the officer]. . . and who makes no threatening movement of any kind, even though the suspect had engaged in a shoot-out with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers."). Here, "[i]f jury accepts plaintiff's version of the facts

to be true, the officers would not be entitled to qualified immunity 'because it is a violation of clearly established law for an officer to use deadly force against someone who poses no threat of serious harm to the officers or others.'" *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1086 (9th Cir. 2017) (citation omitted).

Defendants argument that the officers conduct did not violate clearly established law assumes that their submitted version of the facts is undisputed. As noted above, there are genuine disputes of material fact with respect to whether Thompson posed a threat of injury to officer Defendants when they shot him. "Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." *Wilkins*, 350 F.3d at 956; *Ruiz v. Sawaya*, No. 11-CV-03126, 2013 WL 5665404, at *4 (N.D. Cal. Oct. 15, 2013) (denying qualified immunity because "evaluation of plaintiff's excessive force claim depends principally on credibility determinations and the drawing of factual inferences from circumstantial evidence, both of which are the traditional functions of the jury."). Since there are triable disputes as to whether Thompson posed an immediate threat of harm to the officers and correspondingly whether excessive force was used, the Court DENIES Defendants' motion for summary judgment on the grounds of qualified immunity.

## B. FOURTEENTH AMENDMENT: FAMILIAL ASSOCIATION

Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *See Lemire v. Cal. Dep't of Corrections & Rehabilitation*, 726 F.3d 1062, 1075 (9th Cir. 2013) (parents and children); *Curnow*, 952 F.2d at 325 (parent). "[T]he Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-47 (1998) (internal quotation marks and citations omitted); *see Lemire*, 726 F.3d at 1075. "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "On the other hand, where a law enforcement officer makes a snap judgment

because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

While Plaintiff contends that the deliberate indifference standard is appropriate, ECF No. 37 at 13, the very brief nature of the encounter weighs in favor of the purpose to harm standard. *See Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (drawing "distinction between situations that evolve in a time frame that permits the officer to deliberate before acting and those that escalate so quickly that the officer must make a snap judgment" and finding purpose to harm standard applied to five-minute altercation that ended in decedent's shooting). However, under either standard the grant of summary judgment is not appropriate here given the disputed factual issues. In *Porter*, the Court noted that in both the Fourth and Fourteenth Amendment contexts "courts reviewing deadly force in response to a supposed public safety threat are presented with a 'factbound morass,' especially when on first glance an officer's use of deadly force appears disproportionate to the nature of the threat." *Porter*, 546 F.3d at 1141. The Court went on to indicate that when there was a "severe and sudden escalation of the situation: where [Decedent's] only violation was non-compliance, [officer's] extraordinary response was to fire five shots[,]" this may have satisfied the purpose to harm standard. *Id.* Taking the facts in the light most favorable to Plaintiff, a reasonably jury could find that there was no legitimate law enforcement purpose for shooting Thompson who was fleeing from the officers – an individual the officers encountered mere seconds before and who was not armed. *See Estate of Elkins v. Pelayo*, 2018 WL 2978522, at *3 ("Regarding Plaintiffs' Fourteenth Amendment claim, a reasonable jury could find, under the facts presented, that shooting a suspect simply to stop him from running away was not a legitimate law enforcement objective.").

Because the Fourteenth Amendment claim implicates the same factual dispute, Defendants' motion for summary judgment as to the fourth cause of action under the Fourteenth Amendment is DENIED.

## C.  STATE LAW CLAIMS: BATTERY, NEGLIGENCE, AND BANE ACT

22

### 1.    <u>Vicarious liability</u>

Defendants move for summary judgment on the remaining state law claims for battery, negligence, and Bane Act violations. These claims are asserted against officers Canatsy and Salinas directly and against Ceres vicariously. Compl. ¶¶ 93, 95, 102, 104, 115, 117.

Defendant Ceres argues that under California Government Code § 815 it cannot be liable for common law torts as a public entity. ECF No. 24 at 20. Plaintiff contends that the basis for holding Ceres liable is not based on common law but rather it is firmly rooted in statute, citing California Government Code § 815.2(a). ECF No. 37 at 16. Under California Government Code § 815.2(a), "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code § 815.2(a). The Ninth Circuit has found that this provision "clearly allows for vicarious liability of a public entity when one of its police officers uses excessive force in making an arrest." *Blankenhorn v*, 485 F.3d at 488 (citing *Mary M. v. City of Los Angeles,* 54 Cal.3d 202 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct.")). Accordingly, the Court's determination as to these state law claims applies both to the officer Defendants and Ceres.

### 2.    <u>Battery And Negligence</u>

Plaintiff's state law claims for battery and negligence under a theory of wrongful death rest on the same facts as the asserted excessive force claim. To prove these causes of action at trial, Plaintiff must demonstrate that Defendants acted unreasonably under the totality of the circumstances. The Court concluded that a material issue of fact exists as to whether the officer Defendants behaved reasonably in using deadly force against the Decedent, noting that there is a factual dispute regarding whether the Decedent posed a threat to the officers' safety. The Court denied Defendants' motion for summary judgment on the excessive force claim on that basis. Since the parties agree that the facts relevant to the

state law claims are identical to those considered in the context of the Fourth Amendment claim, no further analysis is required. ECF No. 24 at 20; ECF No. 37 at 15; *see also Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527, 89 Cal. Rptr. 3d 801, 811 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable."); *Hayes v. County of San Diego*, 57 Cal. 4th 622, 629 (2013) (applying reasonableness standard to determine whether officer was negligent in using deadly force); *Losee v. City of Chico*, No. 16-16541, 2018 WL 3016891, at *3 (9th Cir. June 18, 2018) ("Because a reasonable jury could find that Sergeant Zuschin used excessive force, Losee's battery and negligence claims against the City of Chico must also proceed.") (citing Cal. Gov't Code § 815.2).

There is a material issue of fact as to whether the officers' use of deadly force was reasonable that precludes summary judgment on Plaintiff's state law battery and negligence claims. Defendants' motion for summary judgment as to the state law claims for battery and negligence is DENIED.

### 3.     Bane Act (California Civil Code § 52.1)

Defendants cite *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-45 (9th Cir. 2018) and argue that Bane Act claims requires a finding of "threat, intimidation or coercion" beyond that of the constitutional violation in order to warrant enhanced statutory remedies, beyond tort relief. ECF No. 24 at 20-21. The Defendant merely states the legal standard and argues there is no evidence of a Bane Act claim here without further analysis. *Id.*

The Bane Act authorizes individual civil actions for damages and injunctive relief by individuals whose federal or state rights have been interfered with by threats, intimidation, or coercion. *See* Cal. Civ. Code § 52.1(a) (proscribing interference "by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state"); *see also Jones v. Kmart Corp.*, 17 Cal. 4th 329, 338 (1998) (interpreting Bane Act's use of "interferes" to mean "violates"). The Ninth Circuit has previously held that where a plaintiff

24

brings an excessive force claim rooted in the Fourth Amendment, "the elements of the excessive force claim under § 52.1 are the same as under § 1983." *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013); *see also Chaudhry v. City of L.A.*, 751 F.3d 1096, 1105 (9th Cir. 2014) (same). The Ninth Circuit recognized, in light of more recent California case law, that "the Bane Act requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" *Reese*, 888 F.3d at 1043 (quoting *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)). A plaintiff bringing a claim under the Bane Act relating to an excessive force claim must show that the officer "intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (internal quotation omitted) (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). In other words, a plaintiff must show that a defendant had the specific intent to violate the plaintiff's constitutional rights. This does not require a showing that a defendant knew he was acting unlawfully; "[r]eckless disregard of the 'right at issue' is all that [i]s necessary." *Cornell*, 17 Cal. App. 5th at 804.

After viewing the facts in this case in the light most favorable to Plaintiff, a reasonable jury could conclude that officer Defendants acted unreasonably *and* with reckless disregard for Thompson's rights under the Fourth Amendment when they shot him twice in the back while he was fleeing. Additionally, a jury could find that the use of force, including the successive volleys, was more than necessary under the circumstances. Whether there was a specific intent to violate Thompson's right to freedom from unreasonable seizure as necessary for a Bane Act claim is also dependent on the resolution of the genuine dispute of fact which prevents the grant of summary judgment on the Fourth Amendment excessive force claim. Accordingly, Defendants' motion for summary judgment as to the state law claim under the Bane Act is DENIED.

## D.   **PUNITIVE DAMAGES**

Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (quoting *Smith v. Wade*, 461

U.S. 30, 56 (1986)). A § 1983 punitive damages claim is subject to summary adjudication "where plaintiff fails to produce evidence raising a material question of fact regarding aggravating circumstances or the reckless or callous nature of defendant's actions." *Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1214 (E.D. Cal. 2008) (quoting *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999)). Under California law, a plaintiff may seek punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).

As explained above, the parties here each produce evidence giving rise to a material dispute of fact about whether the Decedent posed an immediate threat to the safety of the officers. Depending on how the jury determines the facts in this case, a reasonable juror could also conclude that one or more of the officer Defendants acted with reckless disregard (or malice) to the Decedent's Fourth Amendment rights in using lethal force. Therefore, summary judgment is not appropriate on the issue of punitive damages, and officer Defendants' motion in that regard is DENIED.

As to Ceres, public entities, like the City, are immune from punitive damages under § 1983 and California law. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials."); Cal. Gov't Code § 818 ("Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant."); *Westlands Water Dist. v. Amoco Chemical Co.,* 953 F.2d 1109, 1113 (9th Cir.1991) ("California Government Code § 818 bars any award of punitive damages against a public entity."). Therefore, Defendants' motion for summary judgment on the punitive damages as to Defendant Ceres is GRANTED.[18]

---

[18] Plaintiff's opposition does not address the issue of the City's liability for punitive damages raised by the Defendants in their motion. ECF No. 24 at 21; ECF No. 37 at 17.

## V. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 24) is **GRANTED IN PART** and **DENIED IN PART:**

1. Defendants' motion for summary judgment is **GRANTED** as to the first, third, fifth and sixth causes of action;

2. Defendants' motion for summary judgment is **GRANTED** as to the punitive damages claim against the City of Ceres, but **DENIED** as to the officer Defendants;

3. Defendants' motion for summary judgment is **DENIED** as to the remaining causes of action; and

4. The Doe Defendants are **DISMISSED**.

IT IS SO ORDERED.

Dated:   **August 30, 2018**                    **/s/ Lawrence J. O'Neill**
                                                      UNITED STATES CHIEF DISTRICT JUDGE